Filed 7/23/14  In re D.M. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re D.M., a Person Coming Under the Juvenile Court Law. | C074095 |
| THE PEOPLE, | (Super. Ct. No. JV125912) |
| Plaintiff and Respondent, | |
| v. | |
| D.M., | |
| Defendant and Appellant. | |

The minor D.M., a ward of the juvenile court under Welfare and Institutions Code section 602, appeals from the juvenile court's order committing him to an out-of-state

1

facility.[1]  The minor contends the juvenile court abused its discretion because in-state facilities were available and adequate to meet his needs.  (Welf. & Inst. Code, § 727.1[2].)

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2007, the prosecutor filed a wardship petition (Welf. & Inst. Code, § 602) alleging the minor -- who was then age 11 and a dependent of the court under Welfare and Institutions Code section 300 et seq. -- had committed felony vandalism (Pen. Code, § 594, subd. (b)(1)) by intentionally breaking a glass door at the Sacramento Children's Receiving Home, where he had been placed following his father's arrest.  The intake report indicated that after the minor and another minor broke the door, they ran through the facility and attempted to break into a medical supply closet and fight other residents.  They also attempted to expose their genitals.  In October 2007, pursuant to the parties' agreement, the juvenile court placed the minor on informal probation for six months, pursuant to Welfare and Institutions Code section 654.2.  In March 2008, the court dismissed the wardship petition.

In February 2009, the prosecutor filed a second wardship petition, alleging the minor committed felony criminal threat (Pen. Code, § 422), aggravated assault (Pen. Code, § 245, subd. (a)), and misdemeanor battery (Pen. Code, § 242).  The intake report

---

[1]  An in-state placement is referred to as "Level A."  An out-of-state placement is referred to as "Level B."

[2]  Welfare and Institutions Code section 727.1, subdivision (b), prohibits placement outside of the state "unless the court finds, in its order of placement, that all of the following conditions are met:  [¶] (1) In-state facilities or programs have been determined to be unavailable or inadequate to meet the needs of the minor.  [¶] (2) [State Department of Social Services has certified that the facility meets all California licensure standards or has been granted a waiver].  [¶] (3) The requirements of Section 7911.1 of the Family Code [authority of State Department of Social Services over out-of-state placements] are met."  This appeal involves only the first condition.

2

indicated that the minor pushed another resident at the Children's Receiving Home to the ground, punched the victim's face, head and shoulders several times, kicked him in the stomach, and bit his ear, all while the victim was on the ground. During the assault, the minor threatened to kill the victim. In March 2009, the juvenile court again placed the minor on informal probation, without making any findings as to allegations.

In September 2009, the prosecutor filed a third wardship petition, alleging misdemeanor theft (Pen. Code, § 484, subd. (a)). The intake report indicated that the minor and two other individuals stole five bottles of alcohol from a Raley's grocery store. The juvenile court extended probation for another six months by stipulation, without admission or finding of the allegation.

In February 2010, the prosecutor filed a fourth wardship petition, alleging another misdemeanor theft, this time involving some snack foods.

In March 2010, the minor admitted the aggravated assault from the February 2009 petition, reduced to a misdemeanor, and the theft allegation of the February 2010 petition. The remaining counts of the September 2009 and February 2010 petitions were dismissed. The court placed the minor on six months probation under Welfare and Institutions Code section 725, subdivision (a).

In September 2010, the court found the minor had successfully completed probation. The court dismissed the 2009 and 2010 petitions and terminated wardship.

In August and September 2011, the prosecutor filed a fifth wardship petition alleging the minor committed robbery (Pen. Code, § 211) -- later amended to attempted robbery, burglary (Pen. Code, 459), aggravated assault with intentional infliction of great bodily injury (Pen. Code, §§ 245, subd. (a), 12022.7), battery with serious bodily injury (Pen. Code, § 243, subd. (d)), misdemeanor exhibiting a replica firearm (Pen. Code, § 417.4), misdemeanor theft (Pen. Code, § 484, subd. (a)), and misdemeanor possession of marijuana at school (Health & Saf. Code, § 11357, subd. (e)). The intake report indicated that the minor entered a liquor store with his face concealed, pointed a replica

3

firearm at the clerk, and demanded "everything you got." A separate allegation of robbery with use of a deadly weapon (Pen. Code, §§ 211, 12022, subd. (b)) against a different victim on a different occasion was later added. According to the intake report, on this occasion, the minor demanded to see the victim's cell phone. Shortly after the victim refused, the minor ran up to the victim and punched the victim in the face and head. A second perpetrator pushed the victim to the ground. While the victim was on the ground, the minor and the second perpetrator repeatedly punched the victim in the head. The victim sustained fractures to his nose and left eye orbit.

In a probation report filed August 12, 2011, the probation department wrote, "The minor's criminal conduct appears to be escalating and his brazen disregard for the rights of others is presenting a serious threat to the community. All the victims concurred the minor is notorious to [*sic*] loitering in the area, and causing havoc in the community. . . . The minor appears to have surrounded himself with negative influences that are criminally oriented. It appears he is on a downward spiral toward a criminal lifestyle and his behavior must be addressed. The minor has an alcohol and drug problem as he has been contacted [*sic*] smoking marijuana at school and stealing alcohol to support his habit. The minor has shown to have [*sic*] anger issues as demonstrated in his resentment toward adult authority and to the victims in the pending matter. The mother is in agreement the minor would benefit from a more structured environment."

In September 2011, the minor admitted the aggravated assault and infliction of great bodily injury.[3] The court dismissed the other allegations with the understanding they could be considered for disposition purposes. The court adjudged the minor a ward

---

[3] It appears the minor now thinks he admitted a different allegation -- brandishing an air-soft pistol at a liquor store clerk and taking $200. However, that count was dismissed, and he pleaded guilty to the assault with great bodily injury (Count Four), though the minor agreed the court could consider dismissed counts.

of the court and committed him to the custody of the probation department for a Level A placement.

On October 31, 2011, the minor was placed at Optimist Youth Homes in Los Angeles. On May 3, 2012, his placement was terminated due to "repetitious acts of misconduct" and he was booked into Juvenile Hall.

In May 2012, the prosecutor filed a motion alleging two probation violations (Welf. & Inst. Code, § 777), in that the minor's urine tested positive for marijuana[4] on April 25, 2012, and he committed misdemeanor battery (Pen. Code, § 242) on April 27, 2012. The minor admitted the marijuana violation, and the battery allegation was dismissed, though the parties agreed it could be considered at the time of disposition.

At the hearing on May 10, 2012, the minor's lawyer informed the court of the parties' understanding "that [the minor] will return to Level A placement. . . . [T]here's also an understanding that [the minor] and I have reached in the process of working on this case that [the minor] understands that further violations would subject him to argument from the district attorney for an adjustment in his placement; specifically for evaluation for out-of-state placement and potentially DJF to which he is eligible for based on the prior admission to his [Welfare and Institutions Code section] 707 offense.[5] [¶] [The minor] is prepared . . . to admit to this violation today of Level A placement with the understanding that his positive progress that he made prior to these violations, the significant progress in light of his history, and that the Court and both counsel support

---

[4] An initial allegation that he also tested positive for amphetamine/methamphetamine was dropped.

[5] Welfare and Institutions Code section 707 states that minors age 14 or older who commit certain offenses, including assault by force likely to produce great bodily injury, are presumed not to be a fit and proper subject for juvenile law unless the court concludes he would be amenable to programs available through the juvenile court. (Welf. & Inst. Code, § 707, subds. (b)-(c).)

that positive progress and continue to encourage that he put his best foot forward to focus on that progress and move passed [*sic*] any other type of conduct that hinders that progress."

The prosecutor noted, "we would have pushed originally and considered pushing again for an out-of-state placement or DJF commitment given the seriousness of the original offenses or the most recent offenses that got [the minor] where he is at. [¶] However, I think it is fair to say that we were very impressed for the first time that he's getting very positive remarks regarding, not just his conduct in school, but his performance in school. [¶] I mean, that's good news and bad news in the sense that it's good news that he's really made improvements, the bad news is it shows us he can do well. [¶] So that convinced us that we should not be pushing and probably is why probation originally didn't file a violation of probation. [¶] But with offenses this serious, if he does not get the message, we will come back to this court and press for a more structured disposition."

The court asked the minor if he understood, and he said, "Yeah." The court continued the minor as a ward of the court and returned him to Juvenile Hall pending placement at a suitable Level A placement. However, the court warned the minor: "You're coming to the end of the path that you're on now. What is in the future -- it's a possibility you could be assigned to a Level B commitment out of state and/or DJF. Both are significant and both of which are likely topic of conversation if you end up coming back again. [¶] Do you understand that?" The minor said, "Yes." The court added: "So you know what you need to do. We're going to give you an opportunity to do it again. Without regard to what happened at the last Level A, you got to be committed to the success at the current one. [¶] Agreed?" The minor said "Yes."

On May 31, 2012, the minor was placed at Clearview Treatment Center in Apple Valley, California.

On October 1, 2012 -- four months after placement at Clearview -- the juvenile court at a permanency planning hearing continued the minor's in-state placement at Clearview, noting he had made "[m]oderate progress" toward alleviating or mitigating the causes necessitating placement.

Four months later, on February 4, 2013, the probation department filed a motion to modify custody status, alleging the minor failed to return to Clearview following a home pass. Clearview terminated his placement, and the court issued an arrest warrant.

On February 24, 2013, the minor surrendered at Juvenile Hall and said he failed to return to Clearview after his home pass because he was "stressing out." The court ordered him detained at Juvenile Hall pending further disposition.

On March 8, 2013, the probation department submitted a memorandum to the juvenile court stating the minor had been placed at Optimist Youth Homes on October 31, 2011, but was terminated on May 4, 2012, "due to poor behavior. The minor had angry outbursts numerous times a week where he would use excessive profanity and disrespected staff members. Prior to being terminated from that program, the minor tested positive for marijuana and admitted to snorting methamphetamine. In addition, the minor began to disregard staff directives, failed to adhere to program rules, was involved in a physical altercation with a peer, and frequently AWOL'd from the facility. Despite several interventions by staff, the minor failed to re-direct his behavior. During his therapy sessions at Optimist the minor struggled to accept responsibility for his behavior."

As for the Clearview placement, the probation department noted, "The minor's overall adjustment was deemed satisfactory. The minor participated in all aspects of the program and was making steady progress. The minor's demeanor and attitude about his placement had changed and he expressed the desire to finally make the changes necessary to make positive changes in his life. The minor began making progress in dealing with

7

the core issues while in placement. The minor began addressing his neglect and abandonment, curbing his impulsivity and anger issues."

The probation department further noted, "the minor has admitted to struggling with returning home by succumbing to the negative influences he once associated with and the temptation of substance abuse. In October 2012, the minor returned from a home pass and submitted a positive test for marijuana. [The officer] believes the minor has the ability to satisfy a program and was near competition [*sic*] before the [motion to modify custody status] was filed. Clearview Treatment is willing to allow the minor to return [*sic*] their program [*sic*] if warranted. [The officer] suggests a higher level of supervision is necessary at this time and perhaps alternatives out of state may be in order. The minor must learn how to identify his external triggers and control his impulsive behaviors."

The probation department stated the minor was assessed at a moderate-high risk to re-offend. He had been committed to in-state placement due in part to "being a risk in the community from his previous criminal mischief. [He] continually surrounded himself with negative influences, indulging in controlled substances, and displayed anger and resentment toward adult authority. [His] overall adjustment in his previous placement was deemed satisfactory. [He] is beginning to make significant changes in his overall participation and behavior in the program. [He] was showing signs of being receptive to his treatment goals and showing an initiative to graduate from the program. However, while on one of his final home passes at his mother's [he] failed to return and indicated to intake officers of not returning due to 'stressing out.' [*sic*] [He] has demonstrated the inability to avoid the negative influences and temptations that have led to his placement.

"In staffing the minor's case with administration [*sic*], it is believed the minor needs a higher level of supervision and rehabilitative services in order to make positive changes in his life. The minor has been afforded two opportunities through level 'A' with a case plan for reunification with the mother. However, the minor failed to utilize the chance by failing to adhere to the program[']s rules.

"Therefore it is respectfully recommended the minor be continued a Ward and committed to Level 'B' placement."

In the out-of-home placement report filed March 26, 2013, the probation department stated the minor's "overall adjustment in placement was unsatisfactory. Although [he] was doing exceptionally well in many areas of the program, he failed to return to his placement after a home pass with his mother resulting in his termination from his placement. [He] has demonstrated his ability to make progress in his treatment and educational goals; however, he continues to make poor choices affecting his chance to reunify with his mother. [He] tends to disregard his mother's concerns and does as he pleases. While in placement, [he] had multiple home passes with his mother without favorable results. According to [his mother], the minor would stay out all night, smoke marijuana, associate with negative peers, and not follow her directives. [She] has indicated that [he] is not ready to return home, nor is she willing to have him return home until he can demonstrate his ability to respect her wishes and abide by her house rules."

The juvenile court referred the minor to the Interagency Management and Authorization Committee (IMAC) for a Level B evaluation. On April 5, 2013, IMAC submitted to the court a one-page, letter stating in two paragraphs that it had considered Level B placement but recommended Level A placement, "based in large part upon the minor's previous participation in out of home interventions. The minor has demonstrated, to some degree, an ability to function in an In-State placement program. While the minor's violation of [p]robation conduct has continued in spite of the Court's intervention attempts, his criminal conduct is not recent. The minor has extensive needs that do not appear able to be met within the parental home. The minor appears in need of a high level of structure, and accountability for his conduct." IMAC stated as the reason why other alternatives were not suitable, that "Level A placement appears best suited to meet his extensive needs at this time. The minor has been afforded Court intervention, and placement services, and has shown some ability to comply with group home

9

instructions.  The minor would likely benefit from therapeutic interventions, education programming and accountability for his behavior.  Further, it is suggested that WRAP services be included in any future In-State placement."

In a memorandum submitted April 15, 2013, the probation department acknowledged IMAC's recommendation but reiterated its recommendation for out-of-state placement.

The juvenile court held a hearing on May 14, 2013.  The minor admitted the two probation violations.  In the course of hearing oral arguments, the juvenile court noted the minor's problem of regressing during home passes, and home passes would be available even with out-of-state placement.  The prosecutor argued the out-of-state placement offered more structure, distance, and time, giving a better chance that it could make a difference in helping the minor understand he has to resist those external triggers.  The minor's counsel argued the minor was making progress because the current probation violation was merely failing to return from a home pass, and he was not found under the influence of drugs or arrested for a new offense, and he excelled in the Level A placement and could not be faulted for wanting to stay with his family, and Clearview was willing to take him back.[6]  The court said:  "Part of the problem though and his repeated appearances back before this court is he's not abiding by court orders.  [¶]  He's a very smart individual. . . .  Having a 3.5 GPA is no small feat, so that's a double-edge sword for [the minor].  He understands and is fully capable, and he is simply making choices not to abide by very clear rules."

---

[6] The minor does not repeat this argument on appeal.  We note it conflicts with reports that the minor stayed AWOL because he was "stressing out" and that he used drugs while at home.  The trial court noted the minor is very smart.  He is presumably smart enough to have waited until drugs left his system before surrendering himself three weeks after he went AWOL.

The court ordered the minor committed to a Level B placement at Woodward Academy in Iowa, stating in part:

"The Court . . . finds that in-state facilities have been determined to be inadequate to meet the needs of [the minor].

"[The minor's trial counsel] made reference to the fact and as documented by Probation, Clearview has indicated a willingness to take [the minor] back, but this court finds that he has had multiple placements not through [*sic*] the two through delinquency, but as argued, he has had multiple placements through dependency.

"These placements and in-state care have failed to assist him in reforming, and he has been unable and/or unwilling to modify his behavior such that I am able to find that the in-state facilities are available and adequate to meet his needs; in fact, I find them unavailable and inadequate. Institutional care in the other jurisdiction is in the best interest of [the minor] and will not produce an undue hardship on him.

"The out-of-state residential facility is licensed for placement of minors and operates under and is inspected pursuant to the standards comparable to those developed by the Board of Directions [*sic*] here in California for similar facilities or programs. The out-of-state residential treatment program meets the requirements set forth in Family Code section 7911.1 of the Welfare and Institutions Code. [*sic*]

"It should be noted . . . we have had the . . . Sacramento County multidisciplinary team assess and make a recommendation relative to his placement. That recommendation is just that. It is guidance. It is not something that this court is bound by. I did consider it, and obviously, have chosen to go to a level B placement that being Woodward." The court adopted the findings recommended by the probation department.

## DISCUSSION

Under Welfare and Institutions Code section 727.1, subdivision (b)(1) (see fn. 2, *ante*), a court may not order out-of-state placement of a ward unless "[i]n- state facilities or programs have been determined to be unavailable *or* inadequate to meet the needs of

11

the minor." (Italics added.) The statute uses the disjunctive "or" and thus the mere availability of an in-state facility does not compel the court to place the minor in-state. (*In re Oscar A*. (2013) 217 Cal.App.4th 750, 757 (*Oscar A*.).)

" 'We review a juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences to support its decision.' [Citation.] ' "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered." ' [Citations.] We will not disturb the juvenile court's findings when there is substantial evidence to support them. [Citation.] ' "In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court law." ' [Citation.]" (*Oscar A., supra*, 217 Cal.App.4th at pp. 755-756.) The scope of discretion depends on the legal principles governing the subject of the action; action that transgresses the confines of the applicable legal principles constitute abuse of discretion. (*In re Kaylee H*. (2012) 205 Cal.App.4th 92, 104-105, citing *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.)

The purpose of the juvenile court law is "to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public. If removal of a minor is determined by the juvenile court to be necessary, reunification of the minor with his or her family shall be a primary objective. If the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents. This chapter shall be liberally construed to carry out these purposes." (Welf. & Inst. Code, § 202, subd. (a).) "Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive

12

care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. . . . When the minor is no longer a ward of the juvenile court, the guidance he or she received should enable him or her to be a law-abiding and productive member of his or her family and the community." (Welf. & Inst. Code, § 202, subd. (b).)

"In determining the judgment and order to be made in any case in which the minor is found to be a person described in [Welfare and Institutions Code s]ection 602, the court shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (Welf. & Inst. Code, § 725.5.)

The minor argues this case is distinguishable from *Oscar A., supra*, 217 Cal.App.4th 750, which affirmed an out-of-state placement, because the juvenile in *Oscar A.* had more egregious and numerous offenses and probation violations. However, we do not view *Oscar A.* as suggesting the minimum conduct required for out-of-state placement. Each case must be decided on its own evidence and reviewed under the abuse of discretion standard. (Welf. & Inst. Code, § 725.5.)

The minor focuses on availability of in-state placement. He overstates the situation when he claims Clearview "expressed its desire to take [him] back -- despite his misconduct" and "invited him back." The record merely shows the probation department reported, "Clearview Treatment is willing to allow the minor to return [to] their program *if warranted*." (Italics added.) In any event, mere availability of in-state placement does not render out-of-state placement an abuse of discretion. (*Oscar A., supra*, 217 Cal.App.4th at p. 757.) Moreover, the court was not bound by IMAC's recommendation, because Welfare and Institutions Code section 727.1 confers the discretion on the juvenile court, not IMAC.

The minor had a significant history of offenses, including assault with infliction of great bodily injury. He argues to the contrary, apparently forgetting he admitted the

13

assault plus agreed the juvenile court could consider the dismissed allegations in making its disposition. The minor also had a significant history of probation violations. He characterizes them as petty matters, "failure to follow rules, substance abuse and desire to return home." However, returning home was particularly problematic for the minor in that he could not avoid the negative triggers presented by the environment there. The juvenile court warned the minor at the May 10, 2012, hearing, that that was his last chance, and if he were returned to court, he would be subject to out-of-state placement. The minor was intelligent enough to make choices keeping him out of court yet chose to violate probation yet again.

We conclude the trial court did not abuse its discretion in ordering an out-of-state placement.

## DISPOSITION

The order of the juvenile court is affirmed.


                                                        MURRAY        , J.


We concur:


    RAYE         , P. J.


    BLEASE      , J.